[No. 1801.]

E. L. CUNNINGHAM v. THE STATE.

1. MURDER — SELF-DEFENSE.— Upon the subject of how far self-defense is available to a slayer who provoked the combat or produced the occasion which necessitated him to kill his adversary in his own defense, a general rule is as follows: If he provoked the combat or produced the occasion, in order to have a pretext for killing his adversary or doing him great bodily harm, or engaged in a combat knowing that it might or would result in the death, or some serious bodily injury which might produce the death, of either party thereto, or if, by his own wrongful acts, he intentionally, with a view thereto, brought about the necessity of taking life, the killing will be murder, no matter to what extremity he may have been reduced in the combat.

2. SAME — CHARGE OF THE COURT.— See the opinion *in extenso* for a charge of the court which, when tested by the rule above announced, is incorrect because it fails to properly qualify the word "produces;" because, in authorizing the jury to determine, from the evidence, which of the combatants, in the first instance, was in the wrong, it does not confine the jury to the occasion of the homicide; and because it does not define the nature or quality of the wrongful act, a definition essential in view of the fact that all wrongful acts of a slayer will not deprive him of the right of self-defense.

3. SAME — PRACTICE.— This court is not called upon to reverse a judgment of conviction because of an erroneous charge in the absence of a bill of exceptions thereto, or a proper special charge refused, unless, looking to the whole record, the court's charge in its entirety, and the statement of facts, it becomes obvious that the rights of the accused were probably prejudiced. In this case the interests of the accused were protected by subsequent clauses of the charge, for which see the opinion *in extenso*.

4. SAME.— The charge complained of contains the following clause, which is objected to by the appellant: ". . . or by his own wrongful acts produces the necessity of taking his adversary's life, in order to save his own, the law will not justify him." *Held*, that the rule thus announced is correct, and has been sanctioned by the highest judicial authority in this State, and that the language in which it is expressed will tolerate no other construction than that the necessity was intentionally produced.

5. SAME — MANSLAUGHTER.— Note the opinion for a state of proof whereunder the trial court did not err in omitting to charge the jury upon the law of manslaughter.

APPEAL from the District Court of Tarrant. Tried below before the Hon. Jo Abbott. (On exchange with the Hon. A. J. Hood.)

On the 26th day of April, 1884, the appellant was convicted in the district court of Tarrant county for the murder of J. W. Fleming, in said county, on the 6th day of November, 1883, and his punishment was assessed at five years' confinement in the State penitentiary.

The opinion of the court sufficiently states the evidence upon which the conviction was had. The two or three witnesses whose

testimony is not condensed in the opinion testified to nothing more than previous quarrels about the right to the use of a water-supply.

The motion for new trial raised the questions discussed in the opinion.

*Furman, Stedman & Capps, Wynne & Carter,* and *Hovencamp & Cummings,* filed an able brief for the appellant.

*J. H. Burts,* Assistant Attorney General, for the State.

HURT, JUDGE. On the 6th of November, A. D. 1883, E. L. Cunningham, in the city of Fort Worth, shot and killed J. W. Fleming. For this offense he was tried, found guilty of murder of the second degree, the jury assessing his punishment at confinement in the penitentiary for five years. Judgment and sentence being rendered and pronounced, he appeals to this court.

To a clear understanding of the errors assigned by appellant, a statement of the facts of the case is necessary. We will not insert all of the evidence; only the leading and, as we think, the controlling facts will be given:

Fleming, deceased, and Cunningham were enemies; a deep and bitter animosity had grown up between them. They had engaged in brawls and mutual criminations prior to the day of the homicide; and on the day of, but prior to, the homicide, McPherson and Vaughn were sitting on beer kegs near Trinity saloon, when appellant came up and sat between them, took out his knife, and said: "I have a knife that can cut deeper and harder than anybody's knife." Vaughn looked up and saw Fleming and Rube Burnett. Fleming drew his knife and whetted it on a wagon tire. Burnett stepped up and began to shave on McPherson's face, and said that he, too, could cut as hard and deep as anybody. Cunningham left. Vaughn saw Cunningham late in the afternoon at Grubb's saloon, at which place Cunningham said that Fleming and Burnett had been following him all day, and that if Fleming ran on him, he would shoot hell out of him. He said that he and Fleming had a difficulty the previous evening; that Fleming had drawn a knife on him at the slaughter pen, and that he, Cunningham, had reached over the fence and knocked the damned old son-of-a-b—h down with a cow foot.

The homicide occurred about half past 5 o'clock on the evening of the 6th of November, 1883, at the crossing of East Weatherford and Harding streets in the city of Fort Worth. Fleming and Cunningham both were on their proper route to their respective homes;

Cunningham and his son being in a wagon. Cunningham and his son passed Fleming about half a block from the place of the homicide, all the parties going in the same direction.

The facts and circumstances immediately attending the homicide are more fully and clearly stated by the witness W. L. Holt. This witness states that he saw the killing, which occurred at the crossing of East Weatherford and Harding streets. That he was going home; that he was overtaken on his way home by Charles Furguson, and they went on together to his house. About the time they got to witness's " place," Cunningham and son drove up in their wagon. They stopped, and Cunningham said to Furguson, " don't you want to ride home?" Furguson got in the wagon. Right at this time he heard Cunningham remark: " That d—d old son of a b—h back there "— the rest of the sentence could not be understood. Witness then heard a remark behind him, which was not understood by him. Looking around, the witness saw Fleming coming up the sidewalk, and saw him put his hand in his right hip pocket. The wagon was now moving on towards him. Witness heard Cunningham say: " You are a G—d d—d old ——— " (using a very filthy epithet), "you have been carrying a pistol for me all day, G—d d—n you." This was repeated. Cunningham then stopped his horse and pulled him back with the reins. At this time Fleming had got about to the crossing of the streets, and stopped. Cunningham backed the wagon until his horse was facing Fleming, when the wagon was stopped, and Cunningham remarked: " You have been carrying a pistol all day for me, and you are too G—d d—n a coward to use it." Fleming then remarked, waving his left hand towards Cunningham: " Mr. Cunningham, you just go on down home and let me alone,"— holding his arm out for three or four seconds. Cunningham then said: " By G—d, this is a public highway, and you've been carrying a pistol for me all day, and you are too G—d d—d a coward to use it." Then there was a pause for two or three seconds, the parties looking at each other; Cunningham still sitting on the seat of the wagon. Silence was broken by Cunningham, who remarked: " By G—d, I'll just get out of the wagon." As Cunningham got out of the wagon, his son caught his arm, and tried to hold him in the wagon — requesting him not to get out. While Cunningham was getting out of the wagon, Fleming, who had, all the time, his hand behind him from the time witness first saw him, drew his pistol from his pocket and let his arm fall down by the side of his right leg with the pistol in his hand. Mr. Fleming then said: " Mr. Cunningham, don't you make many steps towards me." The

parties were then "exactly" thirty-one feet apart. Cunningham then remarked: "You have got a pistol in your right hand now, G—d d—n you,"— ran his hand in his left bosom, pulled out his pistol, and, as it seemed to witness, "he just jobbed it at him and it fired." Fleming dropped dead. Cunningham then remarked: "Now, there it is," got in his wagon, drove to where witness was standing, and said to him: "You know he had a pistol in his right hand before I shot him." Witness informed Cunningham that this was none of his business, and that the best thing for him to do would be to go up town and give himself up. Cunningham replied: "I am going to do that; I am mighty sorry." Witness first saw Fleming after Cunningham made the first remark to witness,— "the d—d son of a b—h," etc. Witness then heard some one speak behind him, looked back, saw it was Fleming, and saw him put his right hand in his hip pocket behind him. "He came by me, and I saw his hand in his pocket, hold of the butt end of his pistol. Cunningham put his right hand in his left bosom twice before he got out of the wagon, but (the witness) saw no pistol at the time. He put his hand in his bosom once while the wagon was backing, and another time after the wagon stopped. Mr. Fleming was walking pretty peart when he came up the sidewalk. When Cunningham first stopped the wagon after Furguson got in it, he had passed off to the south of Weatherford street and east of Harding street, on to an open lot. The deceased stopped about the time the wagon commenced backing, and was then about the middle of Harding street. Cunningham did not advance any after he got out of the wagon. Fleming fell on his right arm, his left arm lying across his breast, and a small new pistol lying on the ground by his side. The position of the body was not changed before the officers came. Witness was not looking at Fleming, but at Cunningham, when he shot, and did not know what Fleming was doing at this precise point of time. Cunningham did not shoot as soon as he got out of the wagon; it was two or three seconds — time enough for Fleming to say, "Now, Cunningham, don't you come many steps towards me."

The above contains a substantial statement of the evidence of the witness Holt.

Mrs. Tucker, near whose house the killing occurred, walked out on her front gallery just as Cunningham was stopping his team, and at this time Fleming was standing in the street with his right hand on his pistol, which was in his hip pocket. When Cunningham remarked, "You followed me yesterday with a knife, and you are following me to-day with a pistol, but you are too much of a coward

to use them," Mr. Cunningham then said: "I will get out of the hack and fight you." As he got out, or about the time he got out, Fleming drew his pistol and turned his arm to his side, and Mr. Cunningham exclaimed: "You draw a revolver on me!" with an oath, and fired. "After Mr. Fleming dropped his hand to his side with the pistol in it, he did nothing further with the pistol that I saw. If he had raised his hand in a position to shoot, I could have seen it. I was looking towards them at the time; the way they were standing, I could see them both. Heard no remark from Fleming she could understand. Saw Fleming make no gesture with his left hand; could not see his left hand. Did not see Mr. Cunningham place his hand in his left bosom before getting out of the wagon. If he had placed his hand in his bosom she could have seen it. Cunningham did not advance on Fleming before shooting — not more than a step, if at all. It is possible that Fleming might have raised his hand with revolver in it, and I not have seen it, but I was in a position to have seen if he had done so. Did not see Cunningham draw the pistol; simply saw him job it out and shoot."

The witness I. B. Tucker corroborated Holt substantially as to the facts sworn to by him.

The witness Parker does not differ from Holt and the Tuckers, touching the matter to which he swore. He also swears that "Mr. Cunningham passed me while I was standing at Mrs. Williams's gate, going east in his wagon. Mr. Fleming passed me just after; he was afoot and walking on the sidewalk. I did not hear any remarks or words between them as they passed. I saw no demonstrations for a fight by either party at that time."

The witness Furguson — the man who got in the wagon with Cunningham — differs in some particulars from all of the above witnesses. He states: "That he was asked to ride in the wagon, got in, and at this time heard Cunningham remark: 'that d—d old rascal (or that damned old scoundrel) has been carrying a pistol for me all day.'" Witness asked Cunningham who, and looked round and saw Fleming coming, walking up towards them. At this time Cunningham's son had started the horse. When witness first saw Fleming he was coming towards them with his right hand behind him, apparently in his hip pocket, saying something which could not be understood. Did not think Fleming was on the sidewalk when first seen by witness. Fleming made some remark to Cunningham, when Cunningham remarked that Fleming had been carrying a pistol for him all day, which was not understood by the witness. Mr. Cunningham's son then drove about fifteen feet and

turned around the corner on Harding street. Mr. Cunningham kept trying to stop the horse, catching hold of the lines, and finally did get hold of them and pulled them, causing the horse to back the wagon so as to throw the front towards Weatherford street. Witness had not seen Fleming all this time, as our backs were turned to him. When the wagon stopped, Fleming was standing on the street looking toward us, saying something and motioning his left hand in the direction of the southeast, his right hand hanging down by his side with his pistol in it. When Cunningham fired, witness threw his eyes on Fleming, who was in the act of falling. Fleming had his right hand in front and partly raised, with his pistol in it. When Cunningham took hold of the lines, his son remarked to him, "You had better go on home, you are drinking," taking hold of his arm and trying to push him away from the lines. Witness also tried to get Cunningham to go on home. Witness did not know that Cunningham was armed until he saw him draw the pistol and fire. Never saw him place his hand in his bosom before the time he drew the pistol. This witness states that "Cunningham was cursing Fleming all the time, calling him names."

C. C. Cunningham, son of the appellant, states that after Furguson got in the wagon they drove around the corner of Harding street, and as they turned the corner they saw that Fleming had a pistol. Witness wanted to go on, but his father said no,— "he would shoot me in the back, but is too big a coward to shoot me in the face." "Furguson and father got out, and Fleming said, 'don't come another step.' The hand which had hold of the pistol began to raise when the shot was fired. Father said to Furguson he had killed Fleming and was sorry for it, and he was going to town and surrender himself; which he did."

Whilst we have not given the testimony of all the witnesses, nor all of the evidence of the witnesses quoted from, we think, however, a sufficiently impartial statement has been given to show the pertinency of the assignments of error made by appellant. In the above statements we have endeavored to be impartial to appellant and just to the State.

The first ground for reversal of the judgment is, because the court erred in the qualifications engrafted upon the charge relative to the law of self-defense.

The portion of the charge complained of is as follows:

"The foregoing instructions in reference to the law of self-defense are to be considered by the jury with this qualification: that if the evidence shows that the defendant provoked the difficulty with the

apparent intention of taking Fleming's life, or by his own wrongful acts brought about the necessity of taking Fleming's life in order to save his own, the law will not justify him. The law is, that if one man provokes a difficulty with the apparent intention of taking the life of his adversary, or by his own wrongful acts, or words coupled with acts, produces the necessity of taking his adversary's life in order to save his own, the law will not justify him; such killing is unlawful. In all cases of homicide it is for the jury to determine from the facts and circumstances in evidence which of the parties was in the wrong in the first instance, and of the motive, purpose and intent which actuated each party.

"If the defendant did not at the time or immediately before the killing, by his wrongful acts, or words coupled with his acts, bring about the difficulty that resulted in Fleming's death, he had the lawful right to act upon the reasonable appearances of danger, and if the circumstances surrounding him at the time of killing, if he killed said Fleming, produced in his mind a reasonable expectation or fear of death or serious bodily harm, as before explained, you will acquit him."

Appellant objects to this charge because he says that "it limits and abridges the right of self-defense in a manner not authorized by law."

Before entering upon a discussion of the questions presented in this assignment, we will give our views as to what are the correct rules applicable to this subject of provoking the difficulty, etc.

We have discussed, in *Cartwright and Nash* v. *The State*, 14 Texas Ct. App., 489, what nature or quality of act, the doing of which will so far abridge one's right of defense, that, if he kill another, although to save himself from death, or great bodily harm, he will yet be guilty of a felonious homicide in some degree. And to that case we refer for our views upon this branch of the subject.

The remaining question to be considered is this: Of what degree of homicide a person is guilty who provokes the combat or produces the occasion in which he is forced to kill another in his own defense?

Two leading distinctions will be found in Cases of Self-Defense, page 227. These are:

1st. "If he provoked the combat or produced the occasion *in order to have a pretext* for killing his adversary, or doing him *great bodily harm*, the killing would be murder, no matter to what extremity he may have been reduced in the combat."

2d. "But if he provoked the combat or produced the occasion without any felonious intent — intending, for instance, an ordinary

battery merely — the final killing in self-defense will be manslaughter only."

The rule applicable to the first distinction is that which applies to the facts of this case, and hence it will alone be discussed. What is the rule? It is that if he provokes the combat, or produces the occasion, *in order to have a pretext for killing his adversary, or doing him great bodily harm*, or *engages in a combat knowing that it might or would result in the death*, or some serious bodily injury which might produce the death, of either party thereto; or by his own *wrongful acts he intentionally*, with a view thereto, brought about the *necessity of taking life*, the killing will be murder, no matter to what extremity he may have been reduced in the combat.

Testing the above charge by this rule, we are forced to the conclusion that it is incorrect. Said charge would have been correct if "intentionally, with a view thereto," had been inserted before "produces." That part of the charge which gives to the jury the right to determine from the evidence which of the parties was in the wrong in the first instance, and the motives, etc., is objectionable, because, 1st. The jury are not confined to the occasion of the homicide. 2d. The nature or quality of the wrongful act is not defined. All wrongful acts of a party will not deprive him of his right of self-defense, and make the party guilty thereof guilty of murder, if he kills in defense of his life, etc.

But let us concede that the charge is erroneous in the particulars above indicated, shall this court of necessity reverse the judgment because of these errors? Appellant failed to object to these charges; nor did he request the proper charges. This being the state of case relating to this matter, by what rule should this court be governed? "Look to the whole record,— all of the charge of the court,— the statement of facts, and if it does not appear to this court, from the whole record, that the rights of the defendant were probably injured, we will not reverse."

Were the defects and errors complained of in the charge calculated, under the circumstances of this case, to injure the defendant? Is it probable that the jury inferred from the charge that, if appellant had been in the wrong relative to any former difficulties with deceased, therefore, to save his life, he could not plead self-defense? Viewed in the light of the next following paragraph of the charge upon this subject, we think that no such inference could have been drawn. Upon this subject what else did the learned judge tell the jury. That, "if the defendant did not at the time or immediately before the killing, by his wrongful acts, or words coupled with his

acts, bring about the difficulty that resulted in Fleming's death, he had the lawful right to act upon the reasonable appearances of danger." . . .

Now, in this part of the charge we find that the jury were confined to the wrongful acts, etc., committed at the time of or immediately before the killing. This being the case, we will presume that the jury received and considered the charge, not in detached parts, but as a whole, and were not misled thereby.

Again, appellant insists that the first part of the charge upon this subject, to wit: That if a man provokes the difficulty with the apparent intention of taking the life of his adversary, and kills to save his life, such killing would be unlawful, is not a correct proposition. We have no doubt of its soundness — construing "apparent" to mean "actual." Not only so, but a homicide committed under such a state of facts would not only be unlawful, but would be murder. Article 615 of the Penal Code, with deference to the opinion of the learned counsel for appellant, has no application to this question.

Appellant also objects to the following part of the charge: " or by his own wrongful acts, or words coupled with acts, produces the necessity of taking his adversary's life, in order to save his own, the law will not justify him." This rule is stated with clearness by Justice Moore, in *Gilleland* v. *The State*, 44 Texas, 356. And we are led to the conclusion from that case that the natural conclusion from such language as the above is that the necessity must be intentionally produced; and that it would be a harsh and constrained conclusion to assume that the jury were told by such a charge that the defendant would be deprived of his right of self-defense, though the necessity be accidentally, unintentionally or innocently produced. That there is a very slight probability of such a construction having been placed upon this part of the charge by the jury; and that, therefore, there was but the faintest probability of this charge (though not technically correct) misleading the jury, especially when the conclusion feared by appellant would have been so absurd; yea, ridiculous. We do not think a jury could be found in the State who would be weak enough to draw such a conclusion from this part of the charge.

Appellant's next ground for reversal of the judgment is for a supposed defect in the charge of the court upon murder of the second degree, and with reference to implied malice. Viewed abstractly, the passages from the charge on these subjects complained of by appellant may not be correct, but, when taken and considered

together with those upon the same subject, we believe, as a whole, they present the law upon these questions. And while upon the subject of the charge of the court in this case, and after having given those requested by the appellant a close analysis, we desire simply to say that we believe the learned judge gave in charge to the jury the law applicable to the case, except the minor defects above mentioned.

The third ground upon which the appellant urges a reversal of the judgment is that the court failed to charge the law of manslaughter. Appellant did not object to the charge upon this ground, nor ask a charge upon this degree of homicide. Was the evidence of such a character as that a failure to charge upon this matter wrought or was reasonably calculated to work an injury to the rights of defendant?

Now, with a view to this question, let us refer briefly to the facts. Appellant had just passed close by deceased in a wagon, in close range of his pistol, and without doubt the parties saw each other. Again, Fleming had another opportunity to kill appellant at the point of the homicide before and when in the act of alighting from the wagon; and of this the appellant was perfectly aware. Let it be conceded that, perhaps, if the killing had occurred when appellant first saw Fleming with his hand upon his pistol, manslaughter might have been involved; that the conduct of deceased, viewed in the light of the relations of the parties, was a sufficient cause or provocation to arouse the passions of appellant, and if he had shot and killed deceased at this point of time, the question of manslaughter might have been presented. But is it not evident from the attending facts that the act — the shooting — was not caused by this passion? Why did defendant not shoot at this time — before the apparently threatening or alarming conduct of Fleming was explained? Passions aroused by such causes assert themselves promptly. For at the time of the shot there were not grounds left upon which to rest manslaughter. If there had been some cause to arouse his anger, rage, resentment or terror, this was completely removed before the killing.

But, concede the cause, was appellant in fact affected thereby? Let him speak to this point: "When he saw the pistol in deceased's hand, he cursed him, and told him that he was too much of a coward to use it." He proposed to get out of the wagon and fight Fleming, after seeing the pistol; Fleming telling him to go home and let him alone. His son and neighbor begged him not to stop, but to go on home. These he heeded not, but got out of the wagon

and continued to press the difficulty. And when, just before the shot, Fleming told him not to come towards him, he pulled his pistol and fired. From the time Fleming was first seen with his hand on his pistol, there is not an act or gesture by him, tending in the slightest degree to show an intention to use his weapon save in his own defense. His conduct and language in unmistakable terms refute any such theory. Fleming had the right to travel that street; not only so, but all the evidence shows that this was his direct route to, and the usual time for him to go home, and defendant knew this. Again, there is no evidence that Fleming placed his hand on his pistol or said anything, until after Cunningham began to curse and abuse him in a most vile manner.

Recurring back to the rule, to wit: " That, the appellant failing to object to the charge, or request the proper charge, this court will look to the whole case, and if it does not appear to us that the rights of defendant were probably injured, we will not reverse the judgment." Under this rule we will look to all the facts of this case in determining whether there was probable injury; and though there may be some fact or conclusion tending to raise the question of manslaughter, yet, no objection being made by appellant in any manner at the time, if the great weight of evidence is such as to preclude the idea that the jury would have (under proper charges on manslaughter) found appellant guilty of this degree of homicide, we should not reverse.

What, then, is this case, viewed in the light of, as we think, the overwhelming weight of evidence? One in which manslaughter is presented? By no means; but a case in which the appellant, without cause, provoked a deadly conflict intentionally, and with full knowledge that it would probably end in the death of one of the parties. Not only provoked the difficulty, but would take no denial of his adversary — denounced him as a coward, and persistently pressed the difficulty to its fatal termination.

That this is *the case* in hand there can be no doubt; nor can we be induced to believe that an honest jury can be found in all this State, though charged fully and liberally upon manslaughter, that would, under the facts of this case, render a verdict of guilty for any offense less than murder.

We are of the opinion that the error committed in failing to charge the law applicable to manslaughter is not, *under the facts of this case*, such error as will require a reversal of the judgment.

We have very carefully considered all of the questions presented in the brief of appellant, and must say that, while we find some

errors in the attitude presented to us, they are not such as will warrant this court in reversing the judgment. The judgment is affirmed.

*Affirmed.*

[Opinion delivered October 29, 1884.]